ROBERT A. DONOVAN & another[1] *vs.* JOHN GARDNER[2]
& others[3] (and a consolidated case[4]).

Nos. 98-P-918 & 99-P-1016.

Essex. May 9, 2000. - December 21, 2000.

Present: BROWN, PERRETTA, & GREENBERG, JJ.

*"Anti-SLAPP" Statute. Statute,* Construction. *Practice, Civil,* Judicial discretion, Motion to dismiss, Attorney's fees, Costs.

In a civil action in which the defendants filed a special motion to dismiss under G. L. c. 231, § 59H (the anti-SLAPP statute) and made an adequate showing that the claims against them were solely or substantially based· on their petitioning activities, the plaintiffs did not then demonstrate that the defendants' exercise of the right to petition was devoid of any factual support or any arguable basis in law or that the defendants' acts in opposing the plaintiffs' use of their property as a horse farm caused the plaintiffs any injury: a Superior Court judge correctly dismissed the plaintiffs' claims [599-601] and awarded the defendants attorneys' fees and costs as required by § 59H [601]. BROWN, J., dissenting.

CIVIL ACTION commenced in the Superior Court Department on December 8, 1994.

A special motion to dismiss was heard by *Joseph A. Grasso, Jr.,* J.

*Robert D. Canty* for the plaintiffs.

*Christopher G. Betke* for Joseph Matto & another.

*Richard W. Jensen* for Bonnie Gardner & another.

GREENBERG, J. Ironstone Farm in Andover is a large parcel of land owned by the plaintiffs, Richard and Bernadette Donovan.

---

[1] Bernadette Donovan.

[2] While there is some indication that John Gardner died during the pendency of this case in the Superior Court, there is nothing in the record to indicate that a motion was filed to substitute the administrator of his estate as a party.

[3] Bonnie Gardner, Joseph Matto, and Roberta Matto.

[4] The consolidated case involves cross-appeals from an order pursuant to G. L. c. 231, § 59H, awarding attorneys' fees and costs to the defendants.

The defendants own property that abuts Ironstone Farm. In 1960, the plaintiffs built a house and a garage on the farm. Over the next twenty years, they added a barn and paddocks, expanding the use of the farm to include breeding and showing horses, giving riding lessons, and other equestrian endeavors. In 1986, the plaintiffs applied to the Andover zoning board of appeals for a variance to erect an enclosed riding structure on the northwest corner of the lot. Several neighbors, including the defendants, Joseph and Roberta Matto and John and Bonnie Gardner, objected to the nonconforming commercial nature of the plaintiffs' operations at the farm (in a residential zone) and the expansion of them by the proposed indoor arena.

It is not necessary to chronicle in detail the history of adversary proceedings which followed. Suffice it to say, over the next eight years, the defendants apprehended a wide variety of environmental and nuisance violations at Ironstone Farm, and brought each one to the attention of various public agencies, e.g., the Andover zoning board, board of health, police department, conservation commission, fire department, town treasurer, building inspector, and the State Department of Environmental Protection. Several of these initiatives resulted in favorable rulings but most were unsuccessful.

In September, 1989, the Gardners hired a helicopter to fly over the farm and take photographs of the farm site to bolster their claims. In December of that year, John Gardner stood at the border between his property and the plaintiffs' property and uttered several angry epithets in the presence of the plaintiffs' son. A similar incident occurred on April 1, 1990, in front of some of the plaintiffs' clients. During the period between 1990 and 1994, there were numerous additional incidents between the parties.

Finally, on December 8, 1994, the plaintiffs brought the action which led to this appeal. In six counts alleging abuse of process, invasion of privacy, civil conspiracy, intentional interference with advantageous business relations, civil rights violations, and intentional infliction of emotional distress, the plaintiffs complain that the defendants' resort to various governmental agencies, the fly-over, and the name-calling constitute tortious harassment.

In due course the parties completed discovery, and on December 26, 1997, three years after the plaintiffs' complaint was filed, the Mattos filed a special motion to dismiss under

G. L. c. 231, § 59H, which was allowed by a Superior Court judge.[5] The plaintiffs appeal.

1. Under the so-called "anti-SLAPP statute," the applicable portion of which is set out in the margin,[6] the defendants claim that their complaints to various regulatory agencies expressing opposition to the plaintiffs' expansion of their riding facility are

---

[5]While the Gardners never filed a document entitled "Special Motion to Dismiss," they did file a memorandum in support of such a motion. Since all the parties and the motion judge acted as if there had been a formal motion from both the Mattos and the Gardners, we treat the Gardners' memorandum as if it had been accompanied below by a special motion to dismiss. Compare *MacCormack* v. *Boston Edison Co.*, 423 Mass. 652, 658 n.8 (1996) (though motion judge's formal order only denied two of three motions, all three considered denied because judge's memorandum of decision discussed and denied all three). In any event, "because there was no objection below, the plaintiffs waived the opportunity to raise the procedural issue on appeal." *Fox* v. *F & J Gattozzi Corp.*, 41 Mass. App. Ct. 581, 584 (1996).

[6]The acronym "SLAPP" stands for "Strategic Lawsuit Against Public Participation." See G. L. c. 231, § 59H. The relevant part of the statute reads as follows:

> "In any case in which a party asserts that the civil claims, counterclaims, or cross claims against said party are based on said party's exercise of its right of petition under the constitution of the United States or of the commonwealth, said party may bring a special motion to dismiss. The court shall advance any such special motion so that it may be heard and determined as expeditiously as possible. The court shall grant such special motion, unless the party against whom such special motion is made shows that: (1) the moving party's exercise of its right to petition was devoid of any reasonable factual support or any arguable basis in law and (2) the moving party's acts caused actual injury to the responding party. In making its determination, the court shall consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based.
>
> . . .
>
> "All discovery proceedings shall be stayed upon the filing of the special motion under this section; provided, however, that the court, on motion and after a hearing and for good cause shown, may order that specified discovery be conducted. The stay of discovery shall remain in effect until notice of entry of the order ruling on the special motion.
>
> "Said special motion to dismiss may be filed within sixty days of the service of the complaint or, in the court's discretion, at any later time upon terms it deems proper.
>
> "If the court grants such special motion to dismiss, the court shall award the moving party costs and reasonable attorney's fees, including those incurred for the special motion and any related discovery

protected "petitioning activity," and that any claim by the plaintiffs based on that opposition is barred. In contrast, the plaintiffs say that aspects of the defendants' purported petitioning activities were not that in fact (such as the helicopter flyover, angry epithets, and agreement by the Gardners with their neighbors to fund the battle) and that the concededly petitioning activities nonetheless amounted to nothing more than a sham or pretense, intended to thwart permitted uses of their property. They say that the defendants' various claims to State and local authorities were motivated by personal animosity, and that such activity is not absolutely privileged.

Massachusetts is one of fifteen States that have enacted anti-SLAPP legislation.[7] In *Duracraft Corp.* v. *Holmes Prods. Corp.*, 427 Mass. 156, 165 (1998), the court decided that to gain the prophylactic effect of the statute, the special movant must make a threshold showing through the pleadings and affidavits that

matters. . . .

"As used in this section, the words 'a party's exercise of its right of petition' shall mean any written or oral statement made before or submitted to a legislative, executive, or judicial body, or any other governmental proceeding; any written or oral statement made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other governmental proceeding; any statement reasonably likely to encourage consideration or review of an issue by a legislative, executive, or judicial body or any other governmental proceeding; any statement reasonably likely to enlist public participation in an effort to effect such consideration; or any other statement falling within constitutional protection of the right to petition government."

[7]The fifteen States include California (Cal. Civ. Proc. Code § 425.16 [West 1999]); Delaware (Del. Code Ann. tit. 10, §§ 8136-8138 [1999]); Florida (Fla. Stat. § 768.29 [2000]); Georgia (Ga. Code Ann. § 9-11-11.1 [1998]); Indiana (Ind. Code §§ 34-7-7-1 to 7-7-10 [1998]); Louisiana (La. Code Civ. Proc. Ann. art. 971 [West 1999]); Maine (Me. Rev. Stat. Ann. tit. 14, § 556 [1995]); Minnesota (Minn. Stat. Ann. §§ 554.01 — 554.05 [West 1994]); Nebraska (Neb. Rev. Stat. §§ 25-21,241 — 21,246 [1994]); Nevada (Nev. Rev. Stat. §§ 41.637, 41.650 [1997]); New York (N.Y. Civ. Rights Law §§ 70-a, 76-a [McKinney 1992]; N.Y. C.P.L.R. § 3211[g], 3212[h] [McKinney 1992]); Oklahoma (Okla. Stat. Ann. tit. 12, § 1443.1 [1981]); Rhode Island (R.I. Gen. Laws §§ 9-33-1 to 9-33-4 [1993]); Tennessee (Tenn. Code Ann. §§ 4-21-1001 to 4-21-1004 [1997]); Washington (Wash. Rev. Code §§ 4.24.500 to 4.24.520 [1989]). A sixteenth State, Colorado, follows a judicially created anti-SLAPP doctrine. See *Concerned Members of Intermountain Rural Elec. Assn.* v. *District Ct.*, 713 P.2d 923, 924-925 (Colo. 1986).

the asserted claims against it are "based on the petitioning activities alone and have no substantial basis other than or in addition to the petitioning activities." *Id.* at 167-168. Once that showing appears, the burden shifts to the nonmoving party to show that the special movant's petitioning activity is "devoid of any reasonable factual support or any arguable basis in law." *Id.* at 165.

Here, the defendants made an adequate initial showing that the claims against them were based on their petitioning activities alone, or at least had no substantial basis other than those activities. While various regulatory agencies and the courts rejected most of their objections, their petitioning activity raised timely concerns with the proper authorities, including the zoning board, and the conservation commission concerning the environmental impact of the plaintiffs' expansion of the farm.

After this threshold showing, the burden shifted to the plaintiffs to show that "(1) the moving party's exercise of its right to petition was devoid of any reasonable factual support or any arguable basis in law and (2) the moving party's acts caused actual injury to the responding party." G. L. c. 231, § 59H. The plaintiffs failed to make the requisite showing as to either prong.[8]

Aside from repeated assertions that the defendants were out to "get" them, the plaintiffs make no attempt to explain how the defendants' actions were devoid of factual support or legal

[8]Given the result we reach as to the special motion to dismiss, we need not address the defendants' motion for summary judgment, as to which the motion judge correctly took no apparent action. Were we to address the merits, however, we observe that the plaintiffs complain that the defendants' resort to governmental agencies constitutes abuse of process, invasion of privacy under G. L. c. 214, § 1B, civil conspiracy, intentional interference with business relations, violation of civil rights under G. L. c. 12, § 11I, and intentional infliction of emotional distress. However, of the various incidents documented in the materials submitted by the plaintiffs, only some of the defendants' reports to the fire department, board of health, conservation commission, and building inspector occurred recently enough to survive the three-year statute of limitations under any of their theories. It is undisputed that most of the defendants' complained-of conduct occurred prior to December 8, 1992, more than three years from December 8, 1995, the date the plaintiffs' complaint was filed in the Superior Court. In fact, the plaintiffs have admitted that the allegations contained in paragraphs 10 through 102 of their complaint occurred prior to December 8, 1992. See G. L. c. 260, § 2A; *Flynn* v. *Associated Press*, 401 Mass. 776, 782 (1988) (invasion of privacy, civil rights violations, and infliction of emotional distress); *Cuddy* v. *Sweeney*, 7 Mass. App. Ct. 880, 881 (1979) (abuse of process); *Pagliuca* v. *Boston*, 35 Mass. App. Ct. 820, 821-822 (1994) (tortious interference and civil conspiracy).

basis. They concede that the report to the fire department was prompted by a fire burning on their land, that the health board had been called about the mounds of manure they kept near one defendant's property line, and that they were performing operations in a protected wetland just as the defendants reported to the conservation commission. The fact that the incidents were resolved in the plaintiffs' favor (the fire was declared an acceptable controlled burn, the manure piles permissibly located, and the work in a wetland valid under an agricultural exemption to the Wetlands Protection Act) does not mean that there was no colorable basis for their petitions. See *Home Sav. Bank of America, FSB* v. *Camillo*, 45 Mass. App. Ct. 910, 912 (1998) (although party "may turn out to be wrong in the end," her position is not, therefore, frivolous).[9] This case differs from *Vittands* v. *Sudduth*, 49 Mass. App. Ct. 401, 414 (2000), where the nonmovant satisfied the burden of showing her neighbors' suit devoid of any reasonable factual or legal support by submitting "affidavits and documents showing that she had obtained all of the necessary permits . . . *before* [emphasis ours] the neighbors commenced the declaratory judgment action," and that "the neighbors could not have obtained meaningful declaratory relief against her in any event since their suit failed to include a necessary party: the board, which issued the . . . permit."

In the instant case, no verified affidavits appear to establish a basis for labeling the defendants' activities a "sham."[10] Throughout the lengthy hearings before various commissions,

[9]The substance of the report to the building inspector does not appear in the record, and so the plaintiffs perforce have failed to show that it lacked any reasonable factual or legal basis.

[10]As to the definition of sham litigation, see *Professional Real Estate Investors, Inc.* v. *Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 (1993), in which the Court outlined a two-part test to define sham litigation. "First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Ibid.* Second, "the court should focus on whether the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor . . . through the use [of] the governmental process — as opposed to the outcome of that process — as an anticompetitive weapon . . ." (citations omitted; internal quotation marks omitted). *Id.* at 60-61. Essentially, then, a sham involves a defendant whose activities are not genuinely aimed at procuring favorable governmental action in any form. *Video Intl. Prods., Inc.* v. *Warner-Amex Cable Communications, Inc.*, 858 F.2d 1075, 1082 (5th Cir. 1988), cert. denied, 490 U.S. 1047, and cert. denied, 491 U.S. 906 (1989).

boards, and courts, the defendants pursued timely administrative remedies that were available in cases of this sort. In his deposition testimony, the plaintiff, Richard Donovan, took the position that the defendants' appearances at public meetings constitute an "assault on his character and that the surveillance of the farm was a form of intimidation." From what appears in the materials before us, the defendants' appearances before the various administrative agencies indicate that they were acting to protect their legitimate private interests. That they were unsuccessful does not, in and of itself, mean that their opposition did not have some basis in law or foundation in fact. We are handicapped — and, so far as appears from the record appendix, so was the motion judge — by not having been furnished with the various findings of the administrative agencies that considered the defendants' complaints, but that is a deficiency which cuts against the plaintiffs. As we have observed, once the defendants' materials in support of the § 59H special motion disclosed legitimate petitioning activity, it was the task of the plaintiffs to contradict the configuration so formed. There was no abuse of discretion or error of law in the judge's decision to grant the defendants' motion.

2. The judge below awarded the defendants, as prevailing special movants, attorneys' fees and costs as required by § 59H. He awarded the Gardners $6,723.00 in attorneys' fees and $181.00 in costs, and the Mattos $7,300.00 in attorneys' fees and $2,270.78 in costs. These amounts were significantly less than what both sets of defendants had sought and documented in their postjudgment motions.[11] Although a plain reading of the statute entitles a prevailing moving party to an award for all reasonable attorneys' fees and costs, "*including* those incurred for the special motion and any related discovery matters," G. L. c. 231, § 59H (emphasis added), in this case the judge was within his discretion to limit the award to only those fees and costs reasonably related to the special motion to dismiss.

Since the statute contemplates that a special motion to dismiss will be made within sixty days of the service of the complaint, and that once made, all discovery will be stayed until the motion is decided, this case is problematic. Over three years passed before the special motion was filed. Significant resources were spent on discovery by both parties in the meanwhile. The

---

[11]The Gardners sought $19,551.00 in attorneys' fees and $181.00 in costs, and the Mattos claimed $23,462 in attorneys' fees and $4,996.83 in costs.

purpose of § 59H is to permit anti-SLAPP suits to "be resolved quickly with minimum cost" by establishing "a procedural remedy for early dismissal." *Duracraft* v. *Holmes Prods. Corp.*, 427 Mass. at 161 (quoting from the preamble to 1994 House Doc. No. 1520). While § 59H permits the court, in its discretion, to allow special motions to be filed after sixty days, it also grants the court authority to do so "upon terms it deems proper." In the circumstances of this case, the motion judge found that it would be unjust to award these defendants all three years' worth of discovery, because the delay in filing the special motion was unwarranted. The motion judge was wise to discourage the strategic delays in filing that might result if all fees and costs attendant upon a late filing were automatically awarded to a successful movant.[12]

To the extent that the plaintiffs, in their cross appeal, argue that the judge's awards are excessive, their brief offers only conclusory statements that do not rise to the level of appellate argument as required by Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975). See *Commonwealth* v. *Bowler*, 407 Mass. 304, 310 (1990). There are no particulars indicated upon which the plaintiffs show the awards were excessive. The judgment is affirmed.[13]

*So ordered.*


BROWN, J. (dissenting). The majority has made a dangerous and quite surprising announcement: NIMBY[1] is alive and well in Massachusetts. I respectfully dissent.

By requiring the plaintiffs to pay damages for being harassed by the defendants, this opinion has turned the law on its head. The majority has wrongly concluded that the conduct of the defendants here was entitled to the legislatively created protection of our anti-SLAPP statute, G. L. c. 231, § 59H. I would like to believe the wise pronouncement of former Justice Good-

---

[12]This is not to say that such an award is never appropriate. Some situations may require extensive discovery before a party learns the facts that indicate that a special motion to dismiss is warranted. We leave such determinations, as the statute indicates, to the motion judge's discretion.

[13]The defendants' request for attorneys' fees and costs in connection with this appeal is denied.

[1]Not in my backyard.

man still has meaning: "[I]f it doesn't make sense, it can't be the law." 16 Mass. App. Ct. 1111, 1125 (June 25, 1983) (Memorial of Justice Reuben Goodman). I would conclude bad faith on the part of the defendants as matter of law, as neither a plausible favorable factual scenario nor a cogent legal ground can be gleaned from this record.

Here, the defendants' intentions could not have been clearer; their meritless claims against the plaintiffs were not merely transparent, but were foredoomed.

In my view, this case is controlled by our holding in *Vittands* v. *Sudduth*, 49 Mass. App. Ct. 401, 413-415 (2000). "Even if [I] were to assume . . . that the neighbors had met their burden [which in my view, they have not] as the special movant, [the plaintiffs] nonetheless met [their] own statutory burden of showing that the neighbors' suit was devoid of reasonable factual or legal support." *Id.* at 414. They and their counsel had to have been aware that the likelihood of the defendants prevailing on the merits was zero as this court had said as much in its 1991 decision. As an aside, it is well known that the possibility of upsetting a variance is real, but the prospect of upsetting a special permit in circumstances, as here, is nil. The plaintiffs also demonstrated the defendants' acts caused them injury. See *Duracraft Corp.* v. *Holmes Prods. Corp.*, 427 Mass. 156, 168 (1998). In short, the defendants' counsel took a position that is beyond reasonable or thoughtful legal analysis.

One additional comment is warranted. Even if some of the causes of action pleaded by the plaintiffs may, as the majority notes, be time-barred, I believe the underlying events may still be relied on as evidence of the defendants' true intentions and their state of mind.

"This is yet another painful example of how 'courts are too frequently called upon to expend the[] limited resources [available] to assist the needy by the machinations of the [selfish and] greedy.' " *Long* v. *Martha's Vineyard Land Bank Commn.*, 35 Mass. App. Ct. 546, 550 (1993) (Brown, J., concurring), quoting from *Piccicuto* v. *Dwyer*, 32 Mass. App. Ct. 137, 140 (1992).